Good morning, Your Honors. May it please the Court, I'm Pete Frost. I represent Appellant's Wilderness Watch in this appeal. Judge Graber, if I may, I'd like to reserve three minutes for rebuttal. We'll try to make that happen. Thank you. May it please the Court, this case concerns the Fish and Wildlife Service's decision to build two new water structures in the Kofa Wilderness in the Sonoran Desert to artificially increase the population of a single game species, bighorn sheep, up to the carrying capacity for that species in the area. These structures do exactly what the Wilderness Act prohibits. They alter natural conditions to supply standing water where none would otherwise exist. Counsel, I hate to interrupt you so quickly. I do have a question about the difference between a wildlife refuge and a wilderness refuge and a wilderness area. If these structures had been constructed in the refuge as opposed to the wilderness area, would we be here? Not on behalf of my clients, Your Honor. Okay. So the concern is that this thing, and one of these structures was only built, like, 1.1 miles inside the wilderness area. Is that right? If it had been built on the other side of the road, you wouldn't be here today? That's correct, Your Honor. They were built in wilderness. Look, if it had been built two-tenths of a mile, if it had been built one-tenth of a mile plus the distance of the road in the other direction, that would have been built in the wilderness refuge, and you wouldn't be here. Wildlife refuge. Oh, the wildlife refuge. Well, I believe going the distance from these structures, it would be on Bureau of Land Management lands. But, yes, that is this case. And it is a very important distinction. And since we've broached the topic, I'd like to turn immediately to that. Before you start, now, my understanding is the area where this pipe tank was built or buried in, it's both wilderness and refuge. Is that right? That's correct. I mean, they overlay each other. I mean, that's the problem here, isn't it? I mean, which, you know, you know, which statute controls the overlay? That's the legal issue in this case, in our view, yes, absolutely. I just want to make sure I understand the problem. Go ahead. Okay. And the answer to the question, which statute controls, is that Congress had made a policy choice that resolves the issue in this appeal. Congress chose deliberately to designate a part of this existing national wildlife refuge as wilderness. And it did so knowing that the Refuge Act, which is the general act that prescribes authorities for the Fish and Wildlife Service on singularly refuge lands, states explicitly that anything done to carry out the purposes of the Refuge Act must comply with all other federal laws. So just as in many other cases, in the discrete areas of the refuge that are designated as wilderness, the prescriptions of the Wilderness Act apply. And the Wilderness Act says this, too. In section 6b, it provides that each agency administering any area designated as wilderness shall be responsible for preserving the wilderness character of the area and shall so administer such area for such other purposes for which it may have been established, i.e., for refuge purposes, as also to preserve the wilderness character. And this is quite the case. Alito, if I'm looking at Title 16, which section were you just quoting from? Section 1133b, Judge Feige. It's the section that immediately precedes subsection c, which is the exception provision also at issue in this case. Oh, no, thank you very much. And this is not an area of law that has not already been settled outside of this circuit. But this Court has touched on this issue in a very important way. In the Wilderness Society v. U.S. Fish and Wildlife Service, the en banc decision, at footnote 17 of that opinion, this Court noted that the solicitor of the interior had written a letter to its client saying that a NILCA, which applies to the Kenai Refuge and also to wilderness areas within that refuge, in fact allowed the fishery enhancement projects that the Fish and Wildlife Service had built within the wilderness. We were pretty careful that that, to explain, that that was a commercial use and therefore disapproved. And we recited that a number of times through our opinion, that it was the commercial aspect of all of this that was troubling to us. Yes. Yes. There's no commercial aspect to this. That's correct, Your Honor. Can I take you back to the section that you quoted from? Yes. I've got Title 16 cites, so I'm looking at 1133B that you cited to us. The last sentence in that, in B, says that the wilderness areas shall be devoted to the public purposes of, and lists a number of things that would seem to be sort of incompatible with just leaving a wilderness as a wilderness, including recreational, scenic, scientific, educational, conservation, and historical use. Why is the conservation of the bighorn sheep in the Southwest not a compatible use? The conservation of bighorn sheep in the Southwest is consistent with wilderness, but these listed enumerated purposes in Section Sub C is not the singular purpose for which Congress established wilderness that is referenced in Subsection C. Subsection C says there shall be no structures at all, just as there shall be no commercial enterprise at all, except as necessary to meet minimum requirements for the administration of the area for the purpose, the singular purpose of this chapter. The purpose being defined. The purpose being, as this Court held in High Sierra Hikers v. Blackwell, to preserve the wilderness character, to ensure that natural conditions exist and that the primeval nature and character of these areas be sustained. And wilderness areas shall be devoted to, including recreational and conservation. Those are public uses that are consistent with what public. But there's no commercial use here. I realize that, Your Honor, but structures are equally prohibited, just as commercial enterprise is. The issue here is whether, as the Fish and Wildlife Service concedes in its brief, does its decision fit the exception? And the exception says, whatever you do within wilderness areas within the refuge must be consistent with the purpose of this chapter. And in the Wilderness Society case in this Court, this Court noted, ANILCA allows the construction of fishery enhancement projects, not only in refuges, but also in the wilderness within the refuge. But that doesn't matter to us, because the issue here is the prescriptions of the Wilderness Act in the wilderness area within the Kenai. And that Act does not allow commercial enterprise. And therefore, whatever ANILCA allows, as the more general organic authority doesn't apply. Let's suppose that the wilderness area was not subsumed within a refuge area, so it was really a very large wilderness area. And we don't have a problem for the bighorn sheep crossing the road between a refuge area, where I think you can see they can be cared for, and the wilderness area. So if the range of these bighorn sheep was exclusively within a wilderness area, would it be incompatible with the Act for the service to take care of those animals in any way or provide additional water for them at any time? No, Your Honor. It's not our position that it is not appropriate for the Fish and Wildlife Service to conserve bighorn sheep. It is our position that whatever techniques the agency uses to approach that objective must be consistent with its obligations under the Wilderness Act. And the Wilderness Act What would be an example of how they could do that, in your view, in this case? What could they do? There are a number of examples that are perfectly compatible with the Wilderness Act. Number one, bighorn sheep ewes, the females, are very skittish during reproduction. And they could have restricted public recreational uses, hikers, backpackers, hunters, and others, going into the areas where ewes are in reproductive cycles. Number two, many areas such as national parks restrict unleashed dogs in order to conserve wildlife species. Bighorn sheep sense dogs as a predator. Could they provide water for them? They couldn't build structures to provide water for them, no. Could they fill the natural, is it tenakas, is that what we call them, the natural basins that collect rainwater? Could they refill those with water from trucks? No. They could allow tenakas that predated wilderness designation when this was just a refuge to continue to be used. And in fact, they are doing that with the old McPherson and Yaki tanks. But no, they can't use motorized uses to fill those tanks. Can they repair the structures that already exist? Not under the reasoning of Judge Ishii in High Sierra Hikers v. U.S. Forest Service, which concerned the prospective repair of check dams in the Sierra Nevada. His reasoning, which we agree with, is that when Congress makes explicit certain prohibitions in wilderness areas, they must be enforced. And if I may, the 11th Circuit has addressed this issue in a very close analog. In the Wilderness Watch v. Manila case, the Park Service, which administers a wilderness area called Cumberland Island, which is within a national park, asserted that it was appropriate for the agency to use motor vehicles to conserve historic properties within the wilderness because it had the obligations to do so under the National Historic Preservation Act. And the 11th Circuit said, no, whatever obligations you may have under your general authorities under another act, you must carry them out by whatever techniques are appropriate under the Wilderness Act. That was the holding of that court. And again, the footnote 17 in this court says, we appreciate that ANILCA may allow fish enhancement projects within wilderness, within this refuge, but that doesn't answer the question here. The question here is, what does the Wilderness Act allow? If the bighorn sheep had landed on an endangered species list, would that change anything here? Would at that point, would the Forest Service be able to come in and create an artificial tanaha and give them the water they needed if it was drought that was determined to be the principal problem? Now, the legal answer to your question is, Your Honor, the Endangered Species Act does not have the same provision that the Refuge Act has that says anything within the Endangered Species Act must bow to a more specific act that applies to this area because the ESA doesn't apply to any specific area. The factual answer to your question is twofold. There were 390 bighorn in the COFA when the Service made its decision. It's undisputed on this record that the Service has found that 100 animals is the minimum necessary to assure the survival of the species for a century. No, I didn't. I wasn't suggesting that they are an endangered species, but I was asking, if they were an endangered species, would they be able to come in and bring water in artificially? You know, I have thought about this very question, anticipating it, Your Honor, and in every circumstance that I'm aware of where species get listed under the ESA in wilderness, the outcome has been to withdraw human influence from impacting the wilderness in order to allow the species to naturally recover and survive. That was the case, for example, in High Sierra Hikers v. Blackwell. Yeah, but might this be a case where withdrawing influence would allow the species to die? Does that change our obligation? It doesn't under the Wilderness Act. It absolutely does not under the Wilderness Act. How does that interact with the Wilderness Act? Does one of them trump the other one? I think the agencies have an affirmative duty to recover species under the Endangered Species Act. Whether that would require the construction of structures in this wilderness, I don't know. There's 4,500 desert bighorn sheep in Arizona and 800 Rocky Mountain bighorn sheep. There are 20,000 bighorn sheep among the three subspecies in the West. This species is nowhere near the biological status for listing. But to address your question more directly, this Court indirectly answered that in High Sierra Hikers v. Blackwell, because there it affirmed a district court's injunction that to protect the Yosemite toad, which is eligible biologically for listing under the ESA, the appropriate response was to pull back commercial services from pack stock that were impacting the toad. The appropriate response was not to erect fences and structures and do other things prohibited under the Wilderness Act in order, ostensibly, to preserve the species. You are cutting deeply into your rebuttal time, so perhaps you'd like to reserve the remainder. I would like to. Thank you, Your Honor. Thank you. We'll hear from Fish and Wildlife. Good morning, Your Honors, and may it please the Court. Justin Pideaux for the United States. At the council table with me is Anna Seidman, who represents the conservation organization, Intervenors, and Jim, oh, my goodness, Oster, Odenkirk, I'm sorry. In the heat of the moment, I forgot his name. Jim Odenkirk represents Arizona. This case involves a determination by the Fish and Wildlife Service that the construction of two small and nearly invisible water sources nearby to existing roads was necessary to restore a cope of bighorn sheep and was permissible under the Wilderness Act. I'd like to begin this morning by addressing a factual question that Judge Byview is asking with respect to these sources. If the Court looks at ER 55, which is a map of this area, what you will see is that there is a corridor that is outside of the wilderness area in the heart of what is otherwise wilderness, where there are existing roads. So here, there is wilderness area on either side of the roads that are the non-wilderness area proximate to the Yaqui and McPherson tanks. So there is an inability for the service to just go a half a mile away and then suddenly they're outside of the wilderness area once they cross the 200-foot. So the .1 figure was just from the access road that bisects the wilderness area. So the road does not define the line between the wilderness area and the wildlife refuge. That's correct, Your Honor. Okay. The wilderness area is within the wildlife refuge. About 88 percent of the wildlife refuge is within the wilderness area. Well, it wouldn't matter anyway, would it? I mean, a wilderness area is a wilderness area. And if you're half a mile from the edge, you might as well be in the middle as far as what the statute says about uses, correct? That's correct, Your Honor. I think what the legal relevance would be, and I took this to be the implication of Judge Bivey's question, though, and maybe I'm reading into it, that the permission for installations in structures in 1133C is contingent upon a finding of necessity, and that that necessity is the minimum, is minimally required to administer the area. And so if the forest and wildlife site needs to be for what purpose? The Wilderness Act states for the purpose of the Wilderness Act. However, in the Wilderness Act, it states for the purpose of the Wilderness Act. That's correct. And, Your Honor, I think there's sort of been a lot made of whether or not there's an S or not after the word purpose in 1133C. I would refer to this Court to Section 1133A, where the Act states the purposes of the Wilderness Act. We have exactly parallel language, one place with an S, another place without an S. It's our contention that whether or not there's an S here is simply irrelevant. The purpose of the Wilderness Act is to establish wilderness areas, and those wilderness areas are to be managed for a variety of public purposes, including the purpose of conservation. Also in 1133, there is a requirement that in managing an area for those other purposes, wilderness character be maintained. However, if you look at Section 1131, wilderness character is defined in terms of preserving the natural condition of an area at a landscape level. And the presumption is that there shall be no structure or installation within the area, correct? I mean, by statute, it says that. That's correct. Unless it is necessary. To meet the minimum requirements. That's correct, Your Honor. So what is a minimum requirement to administer this area? Well, I think if you refer to – I mean, I would refer you to two sources, Your Honor. One is the regulations that the Fish and Wildlife Service has issued at 50 CFR 35.5. The service has provided that structures and installations are permissible or minimally necessary for the management of the area, rather than – and they have omitted the words for purposes of this chapter. And I think that makes sense because the Fish and Wildlife Service rightly identified the fact that the purposes of wilderness areas and the purposes of wildlife refuges are compatible purposes. Wildlife conservation is a purpose for both. Furthermore, if you look at the Wilderness Management Plan – But I'm concerned about the minimum issue here. It doesn't say most desirable administration of the area. It's minimum. And had these structures not been built or repaired, what is there to demonstrate that that state of affairs would have failed to meet the minimum requirements for administration of the area? Well, in the Fish and Wildlife Service's view, this area was established primarily for the conservation of desert bighorn sheep during a period of their substantial decline. It is the – When you say this area, you're talking about the wildlife – The wildlife refuge. Pardon me, Your Honor. It was established – Not the wilderness. No, Your Honor. The wildlife refuge. Which takes me back to the question here. How do we know that these structures were necessary to meet the minimum requirements for administration of the wilderness area portion of the wildlife refuge? Minimum requirements. I understand that it's desirable. I understand why it might be optimal. I understand why it might be better. But I have difficulty seeing how you've demonstrated that it's – it meets – it would fail to meet the minimum requirements for the wilderness area. I think, Your Honor, that the – in essence, I read this provision as requiring a finding of necessity. If an action is necessary to protect a – in this case, for wilderness conservation purposes, then it is permissible. If you look at the documentation that the wilderness service did – the Fish and Wildlife Service did, it went through an analysis of whether or not there were any alternatives that were available that would not have a lesser impact on the wilderness area. What about doing nothing? What was the result of doing nothing? The service suggested that doing nothing, there would be two effects. One would be that we could expect a continuing decline of this species, which is of vital importance. We've had a very prolonged drought in this area. The species has declined by more than 50 percent. Did they consider other – you know, I'll call it other remedies, such as, you know, further restricting hunting? In the investigative report that the Fish and Wildlife Service put together, they absolutely considered all of these various effects on the sheep. And in point of fact, the translocation program has been suspended so that that is no longer in effect. What has been suspended? I'm sorry. The translocation program where the Fish and Wildlife Service – this population in the COFA historically has been a source population for the reintroduction of COFA desert bighorn sheep into other aspect areas of their traditional habitat where they've extirpated. All this means, you know, at the very least, you know, as everybody agrees, it's not an endangered or threatened species, right? I mean, you know, it may be down a little bit from historical highs, but the problem is, you know, well, it's a little low. You want to build it up, but is that the same as, you know, the minimum requirement necessary? Why do you have to build it up anyway? I think the Fish and Wildlife Service is charged with protecting this species. And in its Wilderness Management Plan, which this Court should defer to under the Coralaska decision of the Supreme Court last term, the Fish and Wildlife Service has determined that where the creation of water and the provision of artificial water is necessary to maintain a healthy COFA desert bighorn sheep population and the minimum tools are being used, that that is compatible with the rules. But healthy – and I'm not sure that I heard an answer to Judge Tashima's question, which is what about the alternative of stopping hunting, which would presumably increase the numbers of sheep because people aren't killing them. Was that considered? And why wouldn't that be even more compatible with the wilderness area? Well, two answers, Your Honor. First, that was considered in this investigative report. Hunting was examined. Hunting was not determined to be a primary factor in the cause of decline. What does that – well, does that mean – okay, I'm sorry. Keep going with your answer. And I think there are two reasons for that. The first is the number of sheep that are involved in hunting activities are very small. We're talking about less than 10 sheep a year. But more importantly, the targets for those sheep are older male sheep. Now, older male sheep are not sort of important from a population biology standpoint because the constraint on a population is it's female sheep, especially in a non-monogamous species like desert bighorn sheep. Obviously, if all of the males had been wiped out or something like that, then you could end up with population-level problems. But here we have a male-only hunt of very few sheep. The sheep tend to be the oldest. And hunting is allowed in the wilderness area as opposed to on the wildlife refuge. It's allowed in both, Your Honor, yes. So I think in terms of the Fish and Wildlife Service's analysis of what was necessary to reverse this dramatic decline of sheep, its determination that hunting was not a factor is well supported in the record. And its determination that it was necessary instead to provide more water to these sheep during this prolonged drought period is well supported. And I would refer this Court's attention to its decision in the High Sierra Hikers case where this Court said that an agency's determination of necessity under the Wilderness Act is entitled to substantial deference. That deference should be particularly acute here where the Fish and Wildlife Service is rendering a determination about wildlife conservation, which is an area that is especially within its technical expertise and knowledge. To move on, there was some discussion of the Eleventh Circuit's case and the Manila decision. And I'd just like to suggest to this Court that that opinion is wholly irrelevant here because in that decision, the Eleventh Circuit said that the preservation of historic properties was not a wilderness purpose. And because it wasn't a wilderness purpose, therefore, it sort of fell outside of the auspices of the Act. Here we have a circumstance where the activity that's being undertaken is for wildlife conservation. And wildlife conservation is a purpose of the Wilderness Act. So we have an agency charged with sort of balancing its obligations to sort of ensure the health of a wildlife species and also maintain the wilderness character of an area. Furthermore, I would suggest to the Court that the agency took a very careful approach here with respect to wilderness character. These projects are extremely small. They take up the – disturb less than an eighth of an acre. Let me ask you to address maybe a more general question, but what is the level of deference do you think, you know, a court is required or should give to what you call this very careful decision of the agency? It's certainly not full Chevron deference, is it? I would suggest to the Court that the – in terms of the action chosen, that action is implementing both the wilderness management policy and the regulation. And so our deference would be accorded to that. Our deference? That's correct. And I would suggest – I mean, okay. Our deference is how much is that? I think that's a lot. You know, our deference is essentially the Coralaska case last year sort of to some deference. And that deference is that it's so long as the agency's decision is not clearly erroneous or contrary to the underlying – or directly contrary to the underlying text that's given controlling weight. So I think that here the agency's decision clearly is compatible with the wilderness management plan. The wilderness management plan speaks of the dual purposes – of the sort of this dual role that the agency has in managing this wildlife refuge and also its wilderness area to both ensure a continued healthy bighorn sheep population and also preserve wilderness character. And that balance was carefully struck here where you have a nearly invisible project that is very close to a road. And I think that is relevant because it is much more visually – less visually jarring where you already have a road in place. In fact, the Yaqui Tank is almost entirely outside of the wilderness area altogether because there was – sort of geographically there was space to construct the tank in the road corridor primarily. The McPherson Tank is within one-tenth of a mile of that. And I think also this Court should note that the agency found that, in fact, wilderness values are furthered by the purposes of this Act because the prior – the old tanks, the old McPherson and Yaqui Tanks, were not very effective and they required a lot of maintenance. And given the drought conditions that the service had now identified as a significant problem for the sheep, were going to require mechanized supplementation. And this project involves much less intrusion into wilderness area than maintaining and supplementing those existing tanks which are, in fact, farther from the road and farther into the wilderness area. Is there a regulation that specifically defines this phrase that we were discussing, minimum requirements for administration of the area? There is not a regulation. I think that the – you know, that phrase is restated in the Official Wildlife Service regulations. However, the Wilderness Management Plan discusses sort of how the service is to balance these situations. And in the Cora-Alaska case, the Supreme Court held that deference was owed to an agency, in that case a memorandum, interpreting a regulation that merely restated the statute. And so similarly, deference is owed here. Unless there are further questions. I don't believe so. Thank you very much, counsel. And, Mr. Frost, you have very little time, but we took some of it with questions, so take a minute, a minute or two. Thank you, Judge Graber. I'll be quite brief. On the deference question, as this Court is aware, there's two different kinds of deference. There's statutory deference to the meaning of a law, and then there's deference that sometimes is accorded to an agency's findings. And as to the first point, the Eleventh Circuit has found, and this Court has found in the Wilderness Society case, this statute is unambiguous. And so that answers that question. As to the findings made by the agency as to the necessity of these structures, counsel is correct that in High Sierra Hikers v. Blackwell, this Court said, we'll defer in this case to the finding because, number one, it was supported by an environmental impact statement, including a 16-page needs assessment that explained necessity, and, number two, it's consistent with the record. In contrast here, this agency categorically excluded its decision from NEPA, which gave the public and no one an opportunity to submit evidence challenging any of its wildlife biologists for the refuge who strongly disagrees about the necessity of these tanks. Judge Graybrook, as to the question of minimum requirements for, you know, necessary for the purpose of this area, I want to emphasize it is undisputed that the government's managerial goal is to saturate the refuge with 800 bighorn, which is the carrying capacity of the area. And it wants to do that in order to continue translocating animals out of the COFA and to continue unabated the hunting program. I thought they had stopped the translocation. They did. Okay. They did when the population level reached 390. But they built the structures in order to inflate it back to 800 because that's among their criteria for continued translocations. But we aren't directly reviewing that, are we, that goal? Well, I think you are because the question of whether, you know, the question of whether an agency's interpretation of the statute is ambiguous is really about in the factual context of the case. Well, part of it goes to whether it's the minimum necessary. Right. Minimum necessary for conservation. Of the wilderness. And is it necessary? Is it necessary? And does it benefit the wilderness to inflate the, you know, the populations of a single game species? And really, as I noted in our briefs, and this is my final point, the dangerous circularity of what it's doing here is these same structures may be enabling the growth and population of mountain lions, which are also indigenous to this wilderness. And this agency has now embarked on a NEPA process to consider killing mountain lions that it considers to be offending because they're preying on bighorn sheep. It's running this refuge and this wilderness area within it as a game farm, and that's not legal under the Wilderness Act. Thank you, counsel. We appreciate the arguments of both parties. And that's a very interesting case. It's been helpful. The case is now submitted.
judges: Tashima, Graber, Bybee